IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PRE-WAR ART, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:09-CV-00559-N |
| | § | |
| STANFORD COINS & BULLION, INC., | § | |
| *et al.*, | § | |
| | § | |
| Defendants. | § | |

## **MEMORANDUM OPINION AND ORDER**

This Order addresses Plaintiff Pre-War Art, Inc.'s (the "Gallery") motion for distribution of Disputed Funds and requests for oral argument [304], [308], [309]. Because the Court determines this distribution to be fair and equitable, the Court orders Ralph S. Janvey (the "Receiver") to pay the Gallery within twenty-eight (28) days of the date of this Order the sum of $534,781 plus accrued interest that the Receiver has been maintaining in a segregated interest-bearing account as required by this Court's prior order. *See* Order [75]. The remainder of the balance may be distributed by the Receiver for distribution through the Receiver's claims process. The Court denies the Gallery's requests for oral argument as moot.

### I. Origins of the Dispute

This case concerns fallout from R. Allen Stanford's Ponzi scheme. This suit relates to Stanford Coins and Bullion ("SCB"), a coin and bullion company and one of the Stanford entities now in receivership. SCB sold coins and metals to the public. Dillon

MEMORANDUM OPINION AND ORDER – PAGE 1

Gage Inc. of Dallas ("Dillon Gage") is a wholesaler of metals, bullion, and coins and was SCB's largest supplier. SCB's relationship with Dillon Gage allowed SCB a credit limit of $500,000, and any payments made to Dillon Gage would reduce SCB's outstanding balance. Dillon Gage eventually increased the credit limit to $1,000,000. During an especially profitable time for the gold market, Dillon Gage allowed SCB to exceed this limit. SCB was never profitable, and soon, SCB owed Dillon Gage more than double its credit limit. As a result, Dillon Gage stopped shipping orders to SCB and its customers. During this time, SBC made three payments to Dillon Gage totaling approximately $1.26 million.

On February 2, 2009, the Gallery placed its order with Stanford Coins & Bullion ("SCB") for 101 gold bars of one kilogram each, wiring $3,028,613 to SCB for the order. SCB promised to deliver one gold bar to the Gallery immediately and deliver the remaining 100 gold bars to the Gallery on March 4, 2009. SCB then ordered the gold bars from Dillon Gage and provided an upfront payment of approximately $3 million, less the 1% commission retained by SCB. Dillon Gage applied this payment to SCB's outstanding debts, applying the $3 million payment to the oldest invoices first. On February 6 and February 13, SCB made two further payments to Dillon Gage. Following these payments, SCB had a credit balance of $1,069,562 with Dillon Gage. Nonetheless, SCB still owed Dillon Gage approximately $2 million to complete payment on the Gallery deal. Several weeks before SCB had promised to deliver the remaining gold bars, Stanford was charged with fraud, and the Court placed all of Stanford's companies, including SCB, into a

receivership. At the time of receivership, SCB had a balance of approximately $1 million to be applied against outstanding orders of $3.5 million, including the Gallery's order.

On February 19, 2009, the Gallery contacted Dillon Gage to inquire whether Dillon Gage would timely deliver the gold. Dillon Gage refused to deliver the gold without instructions from the Receiver and informed the Gallery that, because of SCB's insufficient credit balance, Dillon Gage could not deliver the remaining gold bars until SCB paid an additional $2 million. Dillon Gage subsequently refused to ship the remaining 100 bars to the Gallery. The Gallery sued Dillon Gage in this action, asserting a breach of contract claim as a third-party beneficiary of the contract between SCB and Dillon Gage. The Receiver also sued Dillon Gage (the "Fraudulent Conveyance Action"), claiming that six transfers from SCB to Dillon Gage were fraudulent transfers under TUFTA and should be returned to the Receivership. *See Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377 (5th Cir. 2017). After both the Gallery and the Receiver sued Dillon Gage, Dillon Gage made an application to interplead the remaining credit balance of SCB's account in the amount of $1,069,562 (the "Disputed Funds") and pay it into Court.

The parties agreed to the 2011 Order, under which the Receiver would hold the Disputed Funds in a segregated, interest-bearing account and not disburse them absent further order of this Court or an agreement among the Gallery, the Receiver, and Dillon Gage. Dillon Gage subsequently prevailed in both trials against the Gallery and the Receiver, and the Fifth Circuit affirmed both verdicts. In this action, a jury returned a take-nothing verdict on the Gallery's claims against Dillon Gage. In the Fraudulent Conveyance Action, a jury determined that none of the six transfers from SCB to Dillon Gage were

MEMORANDUM OPINION AND ORDER – PAGE 3

fraudulent. *Dillon Gage*, 856 F.3d 377 (5th Cir. 2017). Thus, Dillon Gage has no unsatisfied claims against SCB and does not need to recover anything from the Receiver to be whole. Because Dillon Gage has no potential claim to the Disputed Funds, the sole issue before the Court is the allocation of the Disputed Funds between the Gallery and the Receiver.

Pursuant to the Court-approved claims process, the Receiver issued a Notice of Determination allowing in full the Gallery's claims against SCB in the amount of $2,998,630. The Receiver has made no distribution to the Gallery thus far on that claim. Final judgment entered in this case confirmed the Gallery's claim against SCB in the receivership claims process while deferring consideration of whether, when, and out of which assets, the Receiver would make any payment on that claim. The Gallery requests the Court to direct the Receiver to disburse the Disputed Funds to the Gallery.

## II. LEGAL STANDARD FOR DISTRIBUTION OF RECEIVERSHIP ASSETS

Federal district courts have broad discretion in fashioning relief in equity receiverships. Once assets are in receivership, "[i]t is a recognized principle of law that the district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership." *Sec. & Exch. Comm'n v. Stanford Int. Bank, Ltd.*, 927 F.3d 830, 840 (5th Cir. 2019) (citing *Sec. & Exch. Comm'n v. Safety Fin. Serv., Inc.*, 674 F.2d 368 (5th Cir. 1982)). Pursuant to these broad powers, courts may authorize any distribution of receivership assets that is "fair and reasonable." *See Sec. & Exch. Comm'n v. Wealth Mgmt. LLC*, 628 F.3d 323, 332-33 (7th Cir. 2010); *Sec. & Exch. Comm'n v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991); *Sec. & Exch. Comm'n v. Byers*, 637 F. Supp. 2d 166, 174

MEMORANDUM OPINION AND ORDER – PAGE 4

(S.D.N.Y. 2009). So long as a court divides the assets "in a logical way," the court's distribution will not be disturbed on appeal. *Sec. & Exch. Comm'n v. Forex Asset Mgmt.*, 242 F.3d 325, 331 (5th Cir. 2001).

When fashioning a restitution order, a district court is acting pursuant to its inherent equitable powers. *See United States v. Durham*, 86 F.3d 70 (5th Cir. 1996). In entering a restitution order, adherence to specific equitable principles, including rules concerning tracing analysis are "subject to the equitable discretion of the court." *Id.* (citing *In re Intermountain Porta Storage, Inc.*, 74 B.R. 1011, 1016 (D. Colo. 1987)). Sitting in equity, the district court is a "court of conscience." Acting on that conscience, a lower court has broad discretion to distribute contested funds in equity.

Federal courts overseeing equity receiverships imposed on a defrauder's estate have taken different approaches as to whether to approve the return of assets through tracing. *See Sec. & Exch. Comm'n v. Credit Bancorp, Ltd.*, No. 99 CIV. 11395 RWS, 2000 WL 1752979, at *14 (S.D.N.Y. Nov. 29, 2000) (citing cases). Typically, when a party can trace its assets, that party is entitled to seek its portion of those funds that remain. *See Durham*, 86 F.3d at 72. However, there is no entitlement on the part of a defrauded party to that measure when it may frustrate equity. *Id.* This principle recognizes that one of the key characteristics of a Ponzi scheme is that the perpetrator of the scheme does not immediately consume all assets. Rather, the perpetrator retains some assets before using them in connection with the fraud. Thus, whether at any given moment a particular victim's assets are still traceable is a "result of the merely fortuitous fact that the defrauders spent the money of the other victims first." *Credit Bancorp.*, 290 F.3d at 89 (quoting *Durham*, 86

MEMORANDUM OPINION AND ORDER – PAGE 5

F.3d at 72). To allow any individual to elevate his position over that of other investors similarly victimized would create inequitable results, in that certain defrauded parties would recoup substantially less of their investment. *See Sec. & Exch. Comm'n v. Elliott*, 953 F.2d 1560, 1569 (11th Cir. 1992). It is for this reason that courts generally determine that a fair and reasonable means of distribution should be calculated *pro rata*, distributing the funds proportionately among victims. Additionally, courts generally give defrauded investors priority over creditors. *U.S. Commodity Futures Trading Comm'n v. RFF GP, LLC*, No. 4:13-CV-382, 2014 WL 491639, at *2 (E.D. Tex. Feb. 4, 2014).

### III. THE COURT GRANTS PRE-WAR ART'S MOTION IN PART

"It is typical in cases involving a receivership imposed on a corporate defrauder that the resources of the receivership estate are insufficient to allow all the victims of the fraud to recoup their losses, as is the situation here." *Sec. & Exch. Comm'n v. Credit Bancorp*, No. 99 CIV. 11395 RWS, 2000 WL 1752979, at *14 (S.D.N.Y. Nov. 29, 2000). "It is also not unusual for investors whose assets are traceable at the time the fraudulent operation is halted to claim that they are entitled to recover those assets in full." *Id.*

Both the Gallery and the Receiver agree that the Court applies an equitable standard and may authorize any distribution that is "fair and reasonable." The Receiver argues that the Gallery has not established the elements required for a constructive trust and that distribution that prioritizes defrauded investors over creditors is fair and reasonable. The Gallery claims that SCB was a solvent entity distinct from the Stanford Ponzi scheme, and that the Fraudulent Conveyance Action collaterally estops the Receiver from disputing this fact. Thus, the Gallery argues, it would be neither fair nor reasonable to distribute the

MEMORANDUM OPINION AND ORDER – PAGE 6

Disputed Funds to defrauded investors at the Gallery's expense because those funds are unrelated to the other victims of the Stanford Ponzi Scheme.

### A. Constructive Trust

The Receiver argues that the Gallery has not established that it is entitled to a constructive trust over SCB's credit balance. The Court notes, however, that the Gallery did not attempt to establish a constructive trust. *See* Plf.'s Mot. for Distribution of Disputed Funds 3 n.3 [304] (The Gallery is "not, in this filing, attempting to brief [a constructive trust] theory"). The Gallery argues that it does not need to prove the constructive trust theory but would nonetheless be able to satisfy the elements of a constructive trust after appropriate discovery. The Receiver argues that the Gallery's omission of a constructive trust argument is fatal to its right to recover from SCB's credit balance. The Court disagrees. The Court possesses inherent authority to oversee equity receiverships and fashion restitution orders. *Durham*, 86 F.3d at 72. Here, the Gallery seeks the "[r]eturn or restoration of some specific thing to its rightful owner or status." *See Credit Bancorp*, 2000 WL 1752979, at 15* (quoting Black's Law Dictionary 1313 (7th Ed. 1990) (defining restitution)).

### B. Collateral Estoppel Does Not Apply

The collateral estoppel doctrine binds a party and those in privity with him when that party had a full and fair opportunity to litigate the issue in the prior suit. Moreover, "collateral estoppel operates only if the 'very fact or point now in issue' was determined in the prior proceeding. It must be 'precisely' the same issue in both cases. Thus, issue

preclusion 'is limited to cases where the legal and factual situations are identical.'" *Ex Parte Taylor*, 101 S.W.3d 434, 441 (Tex. Crim. App. 2002).

To determine if collateral estoppel applies, the Court must determine whether the Receiver had a full and fair opportunity to litigate the issue of SCB's insolvency in its prior suit. "In each case, the entire record . . . must be examined to determine precisely the scope of the jury's factual findings." *Id.* In the case of *Janvey v. Dillon Gage*, the court charge stated "[w]ere the following transfers from SCB to Dillon Gage fraudulent transfers?" (Dkt. No. 224, Fraudulent Conveyance Action). The Court informed the jury that "consideration may be given, among other factors, to whether . . . the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred." *Id.* After the jury returned a verdict in favor of Dillon Gage, the Receiver filed a motion for judgment as a matter of law. The Receiver argued that a reasonable jury was required to find that the transfers were fraudulent in light of direct evidence of fraud and significant circumstantial evidence of fraud, including the insolvency of SCB. However, the Court held that a reasonable jury could have concluded that the transfers in dispute were not fraudulent transfers. The Fifth Circuit affirmed the Court's ruling.

In reviewing the parallel litigation between the Receiver and SCB, the Court has found little to estop the Receiver from arguing that SCB is part of the Stanford Ponzi scheme. Rather, the Fifth Circuit held that "the jury heard significant evidence from which it could have inferred that SCB did not make the transfers with fraudulent intent." *Dillon Gage*, 856 F.3d at 388. The Receiver failed to establish the insolvency of SCB as a matter of law. *Id.* ("[T]he jury was not required to find that SCB was insolvent at the time of the

MEMORANDUM OPINION AND ORDER – PAGE 8

transfers."). It does not follow, however, that SCB was solvent or separate from the Stanford Ponzi scheme, but merely that the Receiver's arguments did not warrant overturning the jury's determination that the transfers were not fraudulent, of which insolvency was merely one factor for consideration. *Id.* at 387 n.5 ("In any event, because Janvey did not attempt to value all of SCB's assets, there is no way to conduct a complete analysis of balance-sheet insolvency."). Simply put, the issue before the jury, this Court, and the Fifth Circuit was whether the transfers between SCB and Dillon Gage were fraudulent. The Court and the Fifth Circuit held that a reasonable jury could have concluded that the transfers were not fraudulent, regardless of the solvency of SCB.

The Gallery cites *Ex Parte Taylor* to demonstrate the breadth of issue preclusion, claiming that the jury's determination precludes further arguments from the Receiver regarding the solvency of SCB. 101 S.W.3d 434 (Tex. Ct. Crim. App. 2002). However, *Taylor* is inapposite to this case. In *Taylor*, the defendant was found not guilty of intoxication manslaughter because the jury determined that he was not intoxicated by alcohol at the time. *Id.* In a subsequent trial, the prosecution sought to relitigate the issue of intoxication by marijuana consumption but was collaterally estopped from doing so. *Id.* Specifically, the court held that the State could not rely on an "alternate theory of intoxication" in the second trial. *Id.* Conversely, this case does not involve the Receiver arguing that the transfers were fraudulent under a new theory. *Taylor* involved the same party litigating the intoxication of a defendant under two theories. Here, the Receiver argues that SCB is an insolvent entity within the Stanford Ponzi scheme, while in the prior litigation, it argued that SCB engaged in fraudulent transfers. Although related, as

MEMORANDUM OPINION AND ORDER – PAGE 9

insolvency is a factor in analyzing fraudulent transfers, they are not "precisely the same issue" before the Court. *Taylor*, 101 S.W.3d 434. Thus, collateral estoppel does not bar the Receiver from denying SCB's solvency.

If SCB truly were solvent and separate from the Stanford Ponzi scheme, distribution of the Disputed Funds to defrauded investors may well be unfair and unreasonable. However, as noted by the Fifth Circuit, "SCB received capital contributions and loans from other Stanford entities." *Dillon Gage*, 856 F.3d at 382. Furthermore, "SCB had a line of credit with Stanford International Bank" and received millions in funds traceable to the Stanford Ponzi scheme. *Id.* While the Gallery argues that Stanford International Bank had cut off SCB's credit line shortly before the Gallery's transfers, the record indicates that this was a result of the impending collapse of the Ponzi scheme rather than the independent nature of SCB as a standalone entity. Regardless of the ultimate solvency of SCB as a standalone entity, an issue undecided by a jury, this Court, or the Fifth Circuit, the Court determines that utilizing SCB's credit balance in part as restitution for Stanford victims would be fair and reasonable because SCB's relation with the Stanford Ponzi scheme.

### C. Tracing Analysis

Even though SCB was related to the broader Stanford Ponzi scheme, the Disputed Funds appear to be traceable directly to the Gallery's payment to SCB. Here, the Disputed Funds were transferred to SCB shortly before the imposition of the Receivership. When dealing with a business with a multitude of transactions dealing with fungible money, it is difficult to determine the origin of any particular funds with perfect precision. However, this case involves a large transfer of funds in the amount of $3,028,613 from the Gallery

MEMORANDUM OPINION AND ORDER – PAGE 10

to SCB, followed almost immediately by a transfer of $3,002,639.10 from SCB to Dillon Gage.  Following SCB's $3 million payment, Dillon Gage immediately began shipping SCB's backlogged orders.  Here, the principal amount of the Disputed Funds is almost identical to the $3 million payment, less the amount shipped in backlogged orders.  Given the transfer of large, identifiable funds and the proximity in time between the Gallery's transfers, SCB's transfers, and the imposition of the Receivership, the Court determines that the Disputed Funds are traceable to the Gallery.

### D.  The Court Determines a Half Disbursement is Fair and Reasonable

Here, the Court is placed in the unenviable position of determining whether a general creditor who can trace its assets is entitled to the remainder of the Disputed Funds, or if defrauded investors, who generally receive priority, are entitled to utilize those funds as restitution.  The Court determines that it is fair and reasonable to disburse half of the Disputed Funds to the Gallery.  First, the Disputed Funds are traceable to the Gallery's transfer to SCB and separate from any CD proceeds from the Stanford Ponzi scheme. Nonetheless, the record is clear that SCB is interrelated with the Stanford Ponzi scheme, and the Gallery's interactions with SCB were merely fortuitously kept separate from the other defrauded investors as a result of the temporal proximity between its transaction with the SCB, the collapse of the Stanford Ponzi scheme, and the imposition of the Receivership.  Had the Receivership been imposed later, it is likely that the Gallery's funds would become irreparably entangled with the other funds in the Ponzi scheme.  Furthermore, courts have generally recognized that defrauded investors receive priority over general creditors.  A full disbursement of the funds to the Gallery would result in the Gallery recovering 35%

MEMORANDUM OPINION AND ORDER – PAGE 11

of its Allowed Claims, while only permitting approximately 5% recovery for defrauded investors. This stark difference between the rates of recovery between two equally innocent victims of the Stanford entities does not strike this Court as fair.

"For a District Court sitting in equity, however, it is important to remember that each investor's recovery comes at the expense of the others." *Byers*, 637 F. Supp. 2d 166, 176 (S.D.N.Y. 2009). Hard choices must be made. *Id.* The Gallery began this suit in March 2009. Over a decade later, after years of successful litigation, and after the Court confirmed the Gallery's claim against SCB, the Gallery requests the Court to disburse $1,068,562, all that remains of its original $2,998,630 purchase. Relegating the Gallery to the Receiver's claims process after years of hard-fought litigation would be neither fair nor reasonable. However, recognizing the general priority of defrauded investors over creditors, the Court declines to order a full disbursement to the Gallery. Thus, the Court grants in part the Gallery's motion to distribute the Disputed Funds and orders the Receiver to distribute one half of the Disputed Funds to the Gallery.

## CONCLUSION

Because the Disputed Funds are traceable to the Gallery and the general principle that defrauded investors receive priority over creditors, the Court determines that it is fair and reasonable to distribute half of the Disputed Funds to the Gallery. Thus, the Court grants in part the Gallery's motion for distribution of Disputed Funds and orders that the Receiver pay the Gallery within twenty-eight (28) days of this Order the sum of $534,781 plus accrued interest that the Receiver has been maintaining in a segregated interest-bearing account as required by this Court's prior order. *See* Order [75]. The remainder of

the balance may be distributed by the Receiver for distribution through the Receiver's claims process. The Court denies the Gallery's requests for oral argument as moot.

Signed February 8, 2021.

_____<br>
David C. Godbey<br>
United States District Judge